[Cite as *Coughlin v. Coughlin*, 2026-Ohio-2535.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

KIMBERLY M. COUGHLIN,                     :

    Plaintiff-Appellee/          :
    Cross-Appellant,

                              :          No. 115353

    v.

                              :

KYLE C. COUGHLIN,

                              :

    Defendant-Appellant/         :
    Cross-Appellee.              :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED
           IN PART; REMANDED
**RELEASED AND JOURNALIZED:** July 2, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-23-393996

---

*Appearances:*

Stafford Cruz Law Company and Kelley R. Tauring, *for
appellee/cross-appellant.*

Spengler Nathanson, L.L.P., and Karin L. Coble, Esq., *for
appellant/cross-appellee.*

MARY J. BOYLE, P.J.:

{¶ 1} Former spouses, appellant/cross-appellee Kyle Coughlin ("Husband") and appellee/cross-appellant Kimberly Coughlin ("Wife") appeal and cross-appeal the judgment entry issued by the domestic relations court granting the parties a divorce and, raising the following assignments of error for review:

**Husband's Assignments of Error**

**Assignment of Error One:** The trial court abused its discretion by refusing to permit a full *Daubert* voir dire of the vocational "expert," thereby admitting unreliable expert testimony in violation of Evid.R. 702.

**Assignment of Error Two:** The trial court abused its discretion in awarding spousal support by imputing $86,000 in additional income to [Husband], where the finding that he was employable and voluntarily underemployed was against the manifest weight of the evidence, especially because Exhibits W and X were not admitted into evidence.

**Assignment of Error Three:** The trial court erred in finding [Husband] committed financial misconduct.

**Assignment of Error Four:** The trial court abused its discretion in dividing the marital property by accepting [Wife's] lower valuation of the marital residence and rejecting [Husband's] evidence of the home's higher fair market value.

**Assignment of Error Five:** The trial court erred and exceeded its statutory authority under R.C. 3105.171(E) when it granted both a distributive award and an unequal division of marital property based on the same finding of financial misconduct.

**Assignment of Error Six:** The trial court abused its discretion by awarding attorney fees.

**Wife's Cross-Assignments of Error**

**Cross-Assignment of Error One:** The trial court erred as a matter of law and abused its discretion in calculating [Husband's] spousal support.

**Cross-Assignment of Error Two:** The trial court erred as a matter of law and abused its discretion by failing to hold [Husband] in contempt of court for his admitted noncompliance with court orders.

**Cross-Assignment of Error Three:** The trial court erred as a matter of law and abused its discretion by failing to award [Wife] treble damages for [Husband's] financial misconduct.

**Cross-Assignment of Error Four:** The trial court erred as matter of law and abused its discretion in issuing its division of marital debt.

{¶ 2} After careful review of the record and relevant case law, we affirm in part, reverse in part, and remand. We reverse the financial misconduct and attorney fees awards and remand for a proper determination under the applicable statutes, and we affirm the remainder of the judgment.

## I. Facts and Procedural History

{¶ 3} Husband and Wife were married in 1996, and had three children as issue of their marriage; the children were emancipated at the time Wife initiated the current divorce proceedings on March 17, 2023.[1] Husband filed his answer and counterclaim in June 2023. The matter proceeded to a trial before a magistrate on

---

[1] We note that in April 2021, Husband filed for divorce in Cuyahoga C.P. No. DR-21-384903. On March 7, 2023, Husband voluntarily dismissed his case, without prejudice.

four separate dates in October 2024.  Initially, Husband appeared remotely by Zoom because he was living in Jordan.[2]  The following relevant evidence was presented.

{¶ 4} At the time of trial, the parties were 54 years old and had been married for over 28 years.  Wife was employed at her father's ("Father") insurance company as well as the cannabis insurance company started by her brother.  According to Wife, she made approximately $35,000 per year at Father's company and $42,000 a year at her brother's company, for a total income of approximately $75,000 a year.  During the marriage, Wife supported Husband's military career, including relocations throughout the United States, and was the primary caretaker for their children.  Husband became a pilot while in the military.

{¶ 5} According to Wife, they had financial struggles early in their marriage, including filing for bankruptcy. Wife testified that she had to work at Father's insurance company approximately "six hours a week" to supplement their income. (Tr. 73.)  In 2011, Husband began working overseas as a private, military contractor in Afghanistan.  Husband completed tactical military missions while abroad.  He started off as a pilot and worked his way up to deputy program manager.  Husband worked overseas until 2022.  According to Husband, he had to quit because of his post-traumatic stress disorder ("PTSD") diagnosis.  Husband's pilot job paid well, "more money than [the parties have] ever made or ever seen."  (Tr. 76.)  His schedule required him to be in Afghanistan for three months and then

---

[2] Prior to living in Jordan and when he returned to the United States, Husband lived with his father in his father's Rocky River home.

home for a month and then redeploy.  Also during that time frame, Husband worked for the State Department from 2017-2018 as a pilot flying dignitaries in and out of the United States.

{¶ 6} Husband testified that while working overseas, he would deposit his paychecks directly into Wife's bank account.  He earned approximately $275,000 annually for his work abroad.  According to Husband, Wife controlled the finances while he was overseas.  Husband further testified he spent little money while abroad and estimated that he had sent approximately $3 million in income to the household.  Husband stated that he returned home to "boxes and boxes full of debt that will never be paid." (Tr. 16.)

{¶ 7} Husband testified that he has tax debt for the 2021-2024 tax years.  The only evidence, however, he provided in support of this contention was a three-page printout stating that he has not filed his 2023 tax return and that as a result he owes $27,792.04.  (Husband's exhibit N.)  Husband did not provide the court with any detailed account balances, nor did he provide any tax returns for the 2022 or 2023 tax years.  At the time of trial, Husband had not filed a return for the 2023 tax year.  Husband also had balances on several credit cards.

{¶ 8} Wife testified that Husband has not "given her a cent since August of 2022" and Father was paying the mortgage because she could not afford it. (Tr. 109.)  Wife entered into a loan agreement with Father for the money he loaned her to pay for the marital home, the car, and insurance during the pendency of the divorce.  At the time of trial, Wife owed Father $84,502.10.  Father paid $66,390.97

in mortgage payments, $11,506.78 in car payments, and $6,604.35 in insurance premiums. Wife further testified that the marital debt was the result of Husband's spending. According to Wife, one of their credit cards had a balance of approximately $32,000 that Husband spent on trips to Dubai and trips with the children. Additionally, Wife incurred $12,000 in debt as the cosigner on an educational loan for one of their children. Wife also has several other credit cards with balances totaling approximately $40,000.

{¶ 9} Husband's income decreased significantly between the filing of his complaint for divorce in 2021 and the trial of this matter in 2024. In 2021, he earned $264,119. His W-2 for 2022 demonstrated that he earned $266,196. In May 2022, the Department of Veterans Affairs determined that Husband had been 100 percent disabled since September 2020. Husband also provided a benefit verification letter indicating the Social Security Administration found that he had become disabled under their rules in December 2022. Husband's veteran disability benefit is $47,746.20 annually and his Social Security benefit is $39,060 annually, making his total annual income $86,806.20.

{¶ 10} Husband also testified about his retirement account with T. Rowe Price ("T. Rowe"). He acknowledged that he had liquidated the account, totaling approximately $100,000, because he "needed it to live on." (Tr. 47.) After the early withdrawal penalty, he received $70,000. According to the October 1, 2020 to December 31, 2020 statement for this account, there was a balance of $203,439.33 with an outstanding loan balance of $14,739.82. (Wife's exhibit No. 30(A).) In

December 2020, the parties withdrew $100,000 to pay off a portion of their debt. The account remained intact until sometime around September 30, 2022, when Husband withdrew $119,271.62.

{¶ 11} Husband stated that the money was deposited into his bank account. After Wife threatened to freeze his bank accounts, he took the money out of the account and used it to buy precious metals. He explained he spent $50,000 on attorney fees and $20,000 on "travel fees for coming back to trial four separate times." (Tr. 48.) Husband maintained that the liquidation occurred during the brief period after he voluntarily dismissed the initial divorce case and before Wife refiled. He further maintained that there was no court order in effect restricting his access to those funds at the time of the withdrawal.

{¶ 12} Husband's Bank of America statements demonstrated that there were two deposits from a Fidelity account between March 10 and 15, 2023, into his Bank of America account totaling $101,023.24. (Wife's exhibit No. 45.) Husband's Coinbase account statement dated March 21, 2023, to October 11, 2023, indicated that he withdrew $5,291.87 from his account and in March 2023, he spent $20,958.15 to purchase silver bars through his JM Bullion account. (Wife's exhibit Nos. 31 and 32). Husband testified that he resold his silver and gold for cash, but he could not locate any documentation concerning the sale of the silver. Husband further testified that he purchased the gold in Romania with cash from his Bank of America account, but also could not recall any details of when he sold the gold.

{¶ 13} Husband further testified about his experiences overseas and the lasting effects of his PTSD stemming from his military service in the middle east. He explained that his work involved "direct ground to ground combat operation [and] air to ground" engagements, often targeting "Taliban protected poppy fields and drug labs" and that "back on the base we would receive ground attacks or indirect fire . . . probably weekly." (Tr. 12-13.) Husband experienced flashbacks, hypervigilance, paranoia, and sensory triggers such as the smell of gunpowder. He explained that the constant state of adrenaline in combat became "normalized" and that once removed from that environment, the underlying emotions of fear and anxiety "get exaggerated because you don't have adrenaline to go with it." (Tr. 28.) Husband further testified that the PTSD manifests in his life with sleeplessness, "compounding so many sleepless nights in a row where you can't tell day from night. It's kind of a dream world to live in and just panicky hyper vigilantly when you are awake. And the headaches, paranoia, compounded by lack of sleep, you can't pay attention, and very forgetful." (Tr. 29.)

{¶ 14} He explained that these symptoms initially felt "normal" to him and he went untreated until he was screened by his unit's medical staff. He was sent for an evaluation, which confirmed his PTSD diagnosis. Husband testified that he sees a counselor once a week, does PTSD progress therapy twice a week, and is on medication. He also sees a psychiatrist every 90 days. Husband has also been diagnosed with migraine headaches, fibromyalgia, lumbosacral or cervical strain, and persistent adjustment disorder.

{¶ 15} According to Husband, his diagnoses substantially impair his daily functioning. He testified that he does not trust his own judgment, cannot focus long enough "to go anywhere or do anything," and experiences panic attacks and sleepless nights if he leaves the house. (Tr. 30.) Husband further testified that his condition renders him "incapable of going back to work[.]" (Tr. 120.)

{¶ 16} Wife called vocational consultant Anne Veh ("Veh") to testify regarding Husband's employability and earning capacity. Veh has a Masters of Arts in Guidance and Counseling and is a licensed social worker in the State of Ohio. She also is a licensed professional clinical counselor and a certified life care planner.

{¶ 17} Veh testified that she has been accepted as an expert in Cuyahoga County. Husband's counsel then requested the opportunity to conduct an inquiry pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), before Veh began her testimony. When counsel asked Veh about the frequency of her interviews with Husband, the court stated, "[Y]ou can question her as an expert, but you can save that for cross-examination." (Tr. 8.) When asking Veh about her methodology, the court stated that this line of questioning was "for your regular cross-examination." (Tr. 9.)

{¶ 18} Husband's counsel then stated that his purpose was to examine Veh's methodology and the reliability of her opinions, not challenge her credibility. The magistrate concluded, "You can ask her about her general qualifications, and you can cross-examine her on cross about this particular case." (Tr. 10.) At that point, counsel ended his *Daubert* inquiry, preserving his objection for the record to the

court's limitation on his ability to conduct a *Daubert* challenge. Counsel additionally objected that Veh's curriculum vitae ("CV") was not attached to her report or disclosed in advance.

{¶ 19} Veh then continued with her testimony. She interviewed Husband on one occasion by Zoom. She also reviewed Husband's resume and described several of the positions he held throughout his career, including service as a United States Marine, a Life Flight helicopter medic transporting patients in emergency conditions, and his work with the Department of State and other agencies on international narcotics and law-enforcement missions in the middle east. Veh also reviewed documentation from the Department of Veterans Affairs. According to Veh, Husband advised that he was diagnosed with PTSD in 2017 and he stopped working in December 2022. While Husband worked as a private contractor, he reported earning $275,000-$280,000 annually. Ultimately, Veh testified that Husband could obtain full-time employment with an earning capacity between $86,430 and $103,000 annually as a self-employed consultant.

{¶ 20} During cross-examination, Veh acknowledged that she did not complete any collateral interviews or any vocational testing. Veh further acknowledged that she reviewed Husband's medical history from the Veterans Administration. When questioned about the symptoms reflected in Husband's records, Veh admitted that she had not discussed them with Husband during her interview with him. Veh testified that she "didn't make specific reference to the 145 pages [of medical records] that [Husband] provided [her]" in her report because she

has "no doctor that's saying [Husband] cannot work" or any "evidence that restricts him vocationally." (Tr. 61.) She explained, "I have nothing from a physician, or psychiatrist, or his therapist, or whatever that's deeming him unemployable." (Tr. 62.)

{¶ 21} Both parties testified regarding the value of the marital residence, but neither provided an appraisal or supporting documentation. There is a mortgage lien on the property. The parties purchased the home in 2015 for $350,000. Wife estimated the value to be $450,000 and testified that the mortgage totaled $318,000. Husband valued the home at approximately $520,000. As of November 2024, the parties' mortgage statement indicated that the outstanding principal balance on the mortgage was $286,541.84. Wife testified that she did not want to sell the marital home because she and one of the parties' adult children reside there. Whereas, Husband requested that the house be sold and the proceeds split after paying the parties' PNC credit card debt and his tax debt.

{¶ 22} The trial concluded with testimony regarding Wife's claim for attorney's fees. Husband objected to the fee bill Wife submitted because it was not provided to him as set forth in the trial court's orders and the bill was dated October 23, 2024, with no subparts to it. According to Husband's counsel, "[I]t's one big long . . . statement as to alleged fees and time and expenses." (Tr. 217.) The magistrate noted the objection and stated he would rule on the objection in his decision. Wife's attorney testified to the bill, stating that it started with a meeting in April 2021 and then nothing transpired until October 2021. The bill included

redacted portions that concerned "matters of attorney/client privilege." (Tr. 218.) Wife's counsel also testified to some of the difficulties of the case, the expenditures and counsel's hourly rate. Counsel stated, at the beginning of the case, his "hourly rate was $600. In 2023 [his] rate increased to $700 an hour. The rates for associates [was] $300 an hour, that hasn't changed." (Tr. 220.) The rate for paralegals was $150 an hour. Counsel further stated, the bill was "reasonable and necessary of the time" and the total time entered on the bill is $82,325. (Tr. 221.) The "out-of-pocket time" was $8,185, making the total $90,510 as of October 23, 2024. (Tr. 222.) On cross-examination, Wife's counsel admitted that his fee bill included time from April 1, 2021, to March 17, 2023, relating to the prior case filed by Husband, which was dismissed. Wife's counsel further admitted that Wife did not file a counterclaim in the prior case.

{¶ 23} Following the conclusion of the trial, the magistrate issued his decision granting the parties a divorce, apportioning the martial property between the parties, finding that Husband committed financial misconduct and ordering him to pay Wife $156,904.12 as a distributive award, ordering Husband to pay Wife spousal support in the amount of $1,250 month, for 108 months, plus $500 per month towards his arrearage, and awarding Wife $12,500 in attorney fees. Relevant to the appeal, the magistrate found:

### Real Estate

The parties own the real estate located [in] Rocky River, Ohio[.] . . . The parties purchased the real estate in 2015 for $350,000.00. . . . [Wife] testified that the real estate was worth $450,000.00 and that the

mortgage presently totaled $318,000.00. [Husband] testified that the house was worth $520,000.00, but he later testified that he did not know how he arrived at that conclusion. [Wife's] testimony as to the value of the real estate is more credible than that of [Husband]. The parties' November 1, 2024, mortgage statement provides that the outstanding principal balance on the mortgage was $286,541.84. . . . Consequently, the undersigned finds that the marital interest in the real estate is $450,000.00 less the mortgage balance of $286,541.84 for a total of $163,458.16.

. . .

The equity in the parties' home is marital and should be divided between the parties. However, [Husband's] interest in the marital home, totaling $81,729.08 will be offset elsewhere herein. Consequently, [Wife] shall be awarded the marital home in its entirety free and clear from any claim of [Husband].

. . .

### Retirement Accounts

[Husband] was the owner of a retirement account earned through his employment . . . administered through [T. Rowe]. On October 1, 2020, this account had a balance of $203,439.33 with an outstanding loan balance of $14,739.82. . . . During the parties' first divorce proceeding, the account remained intact until [Husband] withdrew $119,271.62 on or about September 30, 2022, during the pendency of the parties' first case. It is unclear how he was able to do this while he was operating under a restraining order. In the intervening months, [Husband] converted these funds to precious metals and cryptocurrency (a "Coinbase" account). As a result of [Husband's] actions in liquidating his retirement account in order to prevent it from being restrained, the undersigned finds that the duration of the marriage for the purpose of the parties' retirement accounts is February 18, 1996 to September 30, 2022.

. . .

### Financial Misconduct

. . .

The undersigned finds that [Husband] engaged in a course of conduct designed to conceal and fraudulently dispose of marital assets for the intended purpose of defeating [Wife's] legitimate marital interest in his . . . retirement account held at [T. Rowe].

. . .

[Wife] also asserts that [Husband] liquidated a Fidelity retirement account during the parties' marriage. [Wife] bases this assertion solely on two deposits into [Husband's] Bank of America account in March of 2023. Plaintiff's Exhibit 45. She provided no other evidence of the alleged Fidelity account, where it came from or what it represents. It is just as likely to be another vehicle used by [Husband] to disguise his 401 (k) account as it is likely to be a separate asset. [Wife] did not prove by a preponderance of the evidence that there was an independent Fidelity account separate from other retirement accounts that [Husband] liquidated inappropriately.

The undersigned finds that [Husband] committed acts of financial misconduct in liquidating the [T. Rowe] account in the amount of $119,271.62. Consequently, [Wife] should be awarded $238,543.24 relative to [Husband's] retirement accounts.

The undersigned finds that [Husband] has committed acts of financial misconduct as set forth above. He has willfully taken actions designed to defeat [Wife's] interest in marital property. Further, having taken actions to hide marital assets, [Husband] has then dissipated those marital assets. Alternatively, he may be continuing to conceal them both from [Wife] and this Court. Consequently . . . *[Wife] is entitled to a distributive award and a greater degree of marital property as set forth herein.*

[Wife's] interest in the parties' marital residence in the amount of $81,729.08 should be offset against this award. After the offset of the marital residence, [Husband] owes [Wife] an additional $156,814.16.

### Debts

Between them, the parties have numerous credit accounts and owe substantial sums. Each party holds some unsecured debt in their own name and other debt is held in the parties' names jointly.

. . .

The total amount of [marital] debt [resulting from credit cards in Wife's name] is $39,182.68, resulting in each party being responsible for $19,591.34.

. . .

The evidence demonstrated that the debt to [Wife's] father related to the payment of the mortgage and several of her other expenses while the divorce was pending.  Pursuant to the Temporary Support Order journalized on November 1, 2023, [Husband] was ordered to pay one-half of the mortgage on the marital residence and the parties were otherwise ordered to pay their own expenses.  To the extent that [Husband] was ordered to pay those expenses, it will be addressed herein as a temporary support arrearage.  To additionally divide the debt incurred to pay the expenses that [Husband] was ordered to pay under the Temporary Support Order or to further order [Husband] to pay the debt incurred to pay the mortgage in addition to awarding [Wife] a temporary support arrearage would result in a windfall to [Wife].  Therefore, [Wife] will be responsible for the debt to her father.

. . .

[The total amount of marital debt resulting from credit cards in Husband's name] is $11,263.29 and dividing them equally between the parties results in each party being responsible for approximately $5,581.64.

[With regard to Husband's IRS debt] . . . the undersigned finds that [Husband] should be responsible for this tax liability and if there is a refund it shall be his free from any claim of [Wife].

### Temporary Support Arrearage

On November 1, 2023, the Court issued a Magistrate's Order for Temporary Spousal Support.  That order was effective July 6, 2023, and provided as follows:

**IT IS FURTHER ORDERED** that each party shall be equally responsible for the mortgage payment for the marital residence located [in Rocky River, Ohio].

**IT IS FURTHER ORDERED** that [Wife] shall be responsible for the payment of the associated utilities at the marital residence.

. . .

The mortgage payments from July of 2023 through October [2024] total $47,159.31 and that total is included in the debt to [Wife's] father. . . . Consequently, there is a temporary support deficiency of $23,579.66 owed from [Husband] to [Wife].

### Spousal Support

. . .

[Wife's] . . . total income is $74,363.11 annually.

[Husband]'s income has decreased significantly between the filing of his initial Complaint for Divorce and the trial of this matter. . . . [Husband]'s total annual income is presently $86,806.20.

. . .

### (b) The relative earning abilities of the parties

[Wife] asserts that [Husband] is capable of employment and that he is, therefore, underemployed.

. . .

[Husband] presented several hundred pages of medical history which included multiple diagnoses. . . . However, he failed to identify a single medical report saying that he was unable to work. [Husband] may have the diagnosis that he alleges. However, [Husband] did not identify any of those medical records as proof that he is disabled to the point that he could not maintain employment. [Husband] offered his own self-serving testimony as to the impact of his conditions. While the Courts have held that expert medical testimony is not required to establish an inability to work, [Husband's] testimony is simply not credible. [He is] able to travel extensively throughout Europe and the Middle East. Further, he was able to go to considerable lengths to hide or shield the funds that he liquidated from his retirement account. Finally, despite being diagnosed with service-related conditions as early as 2018, according to the medical records that he provided, [Husband] continued to work until the Court imposed a substantial temporary support obligation based on his employment.

As it specifically relates to [Husband's] Veterans' Administration Disability . . . [t]hose documents list several diagnoses but do not

establish that [Husband] is 100% disabled and cannot maintain employment. . . . Therefore, the undersigned finds that [Husband] is voluntarily underemployed.

. . .

Accordingly, the Court must then determine what income should be imputed to [Husband]. [Wife] offered the expert testimony of [Veh]. The undersigned finds that [Veh] is qualified to testify as an expert. She reviewed [Husband's] employment history, interviewed [Husband], and reviewed medical records provided by [Husband], including, but not limited to, disability determinations from both the Veterans' Administration and the Social Security Administration. [Veh] testified consistently with her report, which reads[:]

> It is my opinion that should [Husband] choose another path, a viable option would be for him to begin his own company as a Self-Employed Consultant.
>
> These individuals set their own hourly or project pay but the general pattern is approximately $42 to $50 per hour or $86,430 to $103,00 per annum, according to the Bureau of Labor Statistics.

As a result of the foregoing, the undersigned finds that [Husband] could earn $86,000.00 annually and maintain his VA disability benefits totaling $47,746.20 annually. Therefore, [Husband's] total annual income for the purposes of spousal support is $133,746.20.

. . .

After a review of all the [statutory factors], the undersigned finds that it is necessary and appropriate that [Husband] be ordered to pay to [Wife] spousal support in the amount of $1,250.00 per month for a period of 108 months. This order shall be modifiable both as to amount and term. This order shall terminate upon the death of either of the parties and may also be modifiable upon [Wife's] remarriage. Additionally, [Husband] shall be ordered to pay an additional $500.00 per month to be credited toward his arrearage as defined above, until such time as it is satisfied in full. A withholding order shall be issued for this spousal support award to the Social Security Administration.

### *Attorney Fees*

[Wife] seeks an award of attorney fees in this matter. She alleges misconduct throughout the litigation process. . . . [Wife] requests an award of $90,510.19 in attorney fees from [Husband].

. . .

Counsel's fee statement included charges from the parties' previous litigation in addition to charges related to the litigation currently pending before this Court. The undersigned declines to award any fees for litigation not currently before the Court. For the present litigation, [Counsel] expended 61.3 hours. [Counsel] testified that he bills at a rate of $700.00 per hour, which totals $42,910.00. [Counsel's] associates billed a total of 33.8 hours on this matter. [Counsel] testified that they bill at $350.00 per hour, which totals $11,830.00. Consequently, [Counsel] attorney fees total $54,740.00 for the litigation presently before the Court.

Upon considering . . . the totality of the circumstances related to this litigation, the undersigned finds that [Husband's] actions caused an increase in [Wife]'s attorney fee expenses and warrant an award of a portion of her fees. Consequently, [Husband] shall be ordered to pay to [Wife] the sum of $12,500.00 in attorney fees.

**THE MAGISTRATE'S DECISION IS TO ORDER:**

. . .

That [Wife] shall retain the marital home free and clear from any claim of [Husband]. She shall be responsible for all mortgages, taxes, and insurance on the marital home.

. . .

That [Husband] shall pay to [Wife] the sum of $156,904.12 representing the remainder of the distributive award, as set forth above, after offsets for [Husband]'s interest in [Wife's] 401(k), [Wife's] Universal Life Insurance Policy, and an equalization of the marital debt of the parties, for which judgment is rendered and execution may issue.

(Emphasis added.) (Magistrate's Decision, Dec. 27, 2024.)

{¶ 24} Both parties filed preliminary objections to the magistrate's decision and supplemental objections. On June 24, 2025, the trial court entered its judgment entry ruling on the objections and finalizing the divorce. The court overruled all the objections from both parties and adopted the magistrate's decision with one modification. Specifically, Husband argued that Wife should be required to refinance the mortgage on the marital residence and use the proceeds to pay off marital debt, with the remainder divided equally. The trial court ordered that Wife shall retain the residence free and clear of any claim by Husband and shall refinance the mortgage or remove Husband's name from the mortgage within six months. If Wife is unable to do so, the house would be sold, with 100 percent of the proceeds awarded to Wife.

{¶ 25} Husband now appeals and Wife cross-appeals, each raising several assignments of error for review. We will combine our discussion of their assigned errors where appropriate.

## II. Law and Analysis

### A. Standard of Review

{¶ 26} We review the propriety of the trial court's determinations in a domestic relations case under an abuse-of-discretion standard. *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989). A trial court abuses its discretion when it exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. As the Ohio Supreme Court has stated, "While a reviewing court in any domestic-relations

appeal must be vigilant in ensuring that a lower court's determination is fair, equitable, and in accordance with law, an appellate court must refrain from the temptation of substituting its judgment for that of the trier-of-fact, unless the lower court's decision amounts to an abuse of discretion." *Martin v. Martin*, 18 Ohio St.3d 292, 295 (1985).

## B. *Daubert* Challenge

{¶ 27} In Husband's first assignment of error, he argues the trial court abused its discretion by qualifying Veh as an "expert" without a full *Daubert*, 509 U.S. 579 (1993), inquiry and by relying on her testimony as the sole basis for imputing an additional $86,000 to Husband's income.

{¶ 28} A trial court has broad discretion in determining the admissibility of expert testimony. *State v. Froman*, 2020-Ohio-4523, ¶ 87. Additionally, it is within the trial court's discretion to decide whether a witness meets the qualifications of Evid.R. 702 to testify as an expert. *In re A.I.H.*, 2024-Ohio-4483, ¶ 59 (8th Dist.). Therefore, we will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Asriian v. Pribish*, 2026-Ohio-1650, ¶ 17 (8th Dist.), citing *In re J.G.*, 2025-Ohio-1933, ¶ 16 (9th Dist.).

{¶ 29} Expert witness testimony is governed by Evid.R. 702, which "permits a witness to testify as an expert only if his opinion or testimony will aid the trier of fact in the search for truth." *Watkins v. Affinia Group*, 2016-Ohio-2830, ¶ 20 (8th Dist.), citing *State v. Clark*, 101 Ohio App.3d 389 (8th Dist. 1995). "An expert's testimony assists the trier of fact if it meets a threshold standard of reliability." *Id.*,

citing *Daubert* at 589-590 and 1994 Staff Notes to Evid.R. 702. "*Daubert* provides the analytical framework for determining whether expert testimony is sufficiently reliable to be admissible under Evid.R. 702." *Id.* at ¶ 21.

{¶ 30} Husband argues that the court erred when it restricted his counsel's ability to question the reliability of Veh's methodology as mandated by the United States Supreme Court in *Daubert* and adopted by the Ohio Supreme Court in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998). In *Daubert*, the Court recognized that a trial court has an important "gatekeeping function" to ensure that evidence is both relevant and reliable. *Id.* at 589. To that end, the *Daubert* Court listed several, nonexhaustive factors to consider when determining whether scientific evidence is reliable. *Id.* at 593-594. These factors include (1) whether a theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. *Id.* The Court explained that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.*

{¶ 31} Contrary to Husband's "mandated" assertion, the "reliability test outlined in *Daubert* is 'flexible.'" *Asriian*, 2026-Ohio-1650, at ¶ 21 (8th Dist.), quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 and 150 (1999). Indeed, "Ohio courts have held that a *Daubert* hearing is not required to determine the admissibility of an expert's testimony in every case." *Id.* at ¶ 23, 24-25, citing *State v. Kegg*, 2025-Ohio-2651 (4th Dist.); *Sliwinski v. St. Edwards*, 2014-Ohio-4655 (9th Dist.); and *Cleveland v. Newell*, 2024-Ohio-2064 (8th Dist.).

{¶ 32} In this case, Husband's counsel requested the opportunity to conduct a *Daubert* inquiry before Veh began her testimony. The magistrate permitted the questioning. When Husband's counsel asked Veh about the frequency of her interviews with Husband, the court stated, "[Y]ou can question her as an expert, but you can save that for cross-examination." (Tr. 8.) Husband's counsel explained that his purpose was to examine Veh's methodology and the reliability of her opinions, not challenge her credibility. The magistrate concluded that counsel could "ask her about her general qualifications" and could "cross-examine her on cross about this particular case." (Tr. 10.)

{¶ 33} Husband contends that this ruling demonstrates a fundamental misunderstanding of the trial court's gatekeeping role because the reliability of Veh's methodology, including the frequency of her interviews, her transferable skills analysis, and her labor market survey, was not a matter of witness credibility for cross-examination, but rather was a matter of admissibility pursuant to Evid.R. 702. We disagree.

{¶ 34} As we stated in *Anderson-Fye v. Mullinax-Fye*, 2024-Ohio-5909 (8th Dist.):

> "The concept of voir dire as applied to an expert witness is concerned with the qualification of that witness as an expert, not the content of his testimony." *Hirschfeld v. Spring Creek Gravel Co.*, 1984 Ohio App. LEXIS 9530, at *7 (3d Dist. Mar. 5, 1984). It is reasonable that, prior to permitting an expert to testify and give expert opinion testimony, his qualification must be established. *Id.* The opposing side is then given an opportunity, before the witness enters any substantive testimony, to cross-examine solely on the issue of qualification.

*Id.* at ¶ 77.

{¶ 35} While Husband contends that his *Daubert* challenge was denied by the magistrate, the record reflects that Husband was given the opportunity to challenge Veh. Rather than addressing her methodology, counsel cross-examined Veh on the substance of her findings and report. At that point, the *Daubert* inquiry ended and Husband had the opportunity on cross-examination to challenge Veh's qualifications, her interview with Husband, and the reliability of her methodology. Based on these facts, we find that the court properly limited the *Daubert* challenge.

{¶ 36} Husband further contends the court compounded the error by excusing Wife's counsel from complying with Civ.R. 26(B)(7)(b) and allowing counsel to present Veh's CV for the first time while she was on the stand in contravention to the rule, which requires parties to submit expert reports and CVs in accordance with the time schedule established by the trial court.

{¶ 37} Wife's failure to attach Veh's CV to her expert report did not frustrate the purpose of Civ.R. 26. Veh was appointed as a vocational expert on August 31, 2023. Thereafter, Wife filed a notice of vocational assessment on December 15, 2023, which included Veh's report. Additionally, Wife listed Veh as a witness on her witness list filed with the court. It is clear that both parties were aware of Veh's report and aware that she would testify at trial because Husband's ability to work was a central issue in this case.[3] Husband had ample opportunity to question Veh

---

[3] Notably, Husband had the opportunity to call his own vocational expert during the pendency of the case and chose not to do so.

on cross-examination. Husband was not unfairly surprised by Veh's expert report, nor did the lack of the CV frustrate the purpose of Civ.R. 26.

{¶ 38} Therefore, Husband's first assignment of error is overruled.

**C. Spousal Support**

{¶ 39} Husband's second assignment of error and Wife's first cross-assignment of error both challenge the court's spousal-support award. Husband argues that the court's finding that he was voluntarily unemployed and its imputation of $86,000 in additional income to him was against the manifest weight of the evidence, especially because two of his exhibits — Exhibits W and X — were not admitted into evidence. Wife argues the court's award improperly disregarded that Husband was previously earning approximately $359,700 annually and paying $18,000 in temporary monthly support. Wife further argues that the court erred by setting a termination date for the support instead of making it indefinite and failed to retroactively modify Husband's temporary support obligation.

{¶ 40} We note that a trial court has broad discretion in determining whether an award of spousal support is proper based on the facts and circumstances of each case. *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67 (1990). "Thus, a spousal support decision is generally left to a trial court's discretion, subject to the statutory factors set forth in R.C. 3105.18(C)." *Saks v. Riga*, 2014-Ohio-4930, ¶ 63 (8th Dist.).

**1. Income Imputed to Husband**

{¶ 41} Here, the court imputed $86,000 of income annually to Husband in its spousal support calculation because there was evidence that he could earn that

much as a self-employed consultant. Husband argues that the court's spousal support imputation is not supported by the record because Veh's analysis was flawed and contradicted by his evidence regarding his PTSD diagnosis.

{¶ 42} There is no language in R.C. 3105.18 that specifically directs the trial court to "impute" income. Rather, the goal is to consider and weigh each spouse's relative earning abilities, along with all the other factors set forth in R.C. 3105.18(C), in arriving at reasonable spousal support in amount and term. *Walpole v. Walpole*, 2013-Ohio-3529, ¶ 60 (8th Dist.), citing *Collins v. Collins*, 2011-Ohio-2087, ¶ 19 (9th Dist.); *Johnson v. Johnson*, 2008-Ohio-4557, ¶ 18 (9th Dist.) ("[T]here is no underemployment provision in R.C. 3105.18."). As with other spousal support determinations, determining the earning capacity of the parties and the amount of income that should be imputed to him or her, if any, are factual determinations to be made by the trial court based on the circumstances of each particular case. *Id.* at ¶ 60.

{¶ 43} Evidence presented at trial supports the court's decision to impute income in the amount of $86,000 per year to Husband. Wife's vocational expert, Veh, testified that based on Husband's employment history, her interview with Husband, and her review of the medical records Husband provided including, but not limited to, disability determinations from both the Veterans Administration and the Social Security Administration, Husband's skills can be transferred to a role such as a self-employed consultant whose salary ranges from $86,430 to $103,00 per year, according to the Bureau of Labor Statistics. Veh further testified that while

Husband has been diagnosed with PTSD, he has "no doctor that's saying [he] cannot work" or any "evidence that restricts him vocationally." (Tr. 61.) She explained, "I have nothing from a physician, or psychiatrist, or his therapist, or whatever that's deeming him unemployable." (Tr. 62.)

{¶ 44} We recognize that when imputing income for spousal support purposes ""'[t]he end result is not to arrive at a specific figure so as to "impute" income; rather, the end result is to consider and weigh the spouses' relative earning abilities along with the other factors in arriving at reasonable spousal support both as to amount and term.'"" *Trainer v. Trainer*, 2024-Ohio-1581, ¶ 34 (8th Dist.), quoting *Valentine v. Valentine*, 2012-Ohio-4202, ¶ 5 (9th Dist.), quoting *Collins v. Collins*, 2011-Ohio-2087, ¶ 19 (9th Dist.). This is exactly what the court did in the matter before us, and as a result, we do not find that the court abused its discretion when it imputed Husband an income of $86,000.

{¶ 45} With regard to Exhibits W and X, Husband maintains that the magistrate improperly refused to admit these exhibits into evidence, which are his medical records from the Veterans Administration and an affidavit authenticating the records. Husband contends that the consideration of these documents, along with his testimony, demonstrate that no spousal support should have been ordered. Husband argues the magistrate erred when he denied their admission on the basis that the affidavit authenticating the records (Exhibit X) was issued after the production of documents.

{¶ 46} The trial court noted and we agree the date of the affidavit and the date of the production of the documents are two different dates. Specifically, the date of the production of records for May 2024 did not match the date of signature for the records custodian, which was July 2024. Furthermore, Husband did not call the records custodian as a witness at trial to explain this discrepancy or authenticate the records.

{¶ 47} Evid.R. 901(A) provides that authentication or identification is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. And, for purposes of admission under Evid.R. 803(B)(6), records that are kept during a regularly conducted business activity are admissible unless "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Here, the court reviewed the records, including the affidavit, and was concerned with the trustworthiness of the records because of the differing dates of production and signature. As a result, we find that the court's exclusion of Exhibits W and X was not an abuse of discretion.

{¶ 48} Husband further maintains that his extensive testimony regarding his PTSD diagnosis, symptoms, treatment, and limitations was ignored by the court. We disagree.

{¶ 49} In the magistrate's decision, the magistrate specifically acknowledged Husband's testimony and exhibits, noting that Husband "presented several hundred

pages of medical history which included multiple diagnoses." (Magistrate's Decision, Dec. 27, 2024.) The magistrate continued:

> However, he failed to identify a single medical report saying that he was unable to work. [Husband] may have the diagnosis that he alleges. However, [Husband] did not identify any of those medical records as proof that he is disabled to the point that he could not maintain employment. [Husband] offered his own self-serving testimony as to the impact of his conditions. While the Courts have held that expert medical testimony is not required to establish an inability to work, [Husband]'s testimony is simply not credible. [Husband is] able to travel extensively throughout Europe and the Middle East. Further, he was able to go to considerable lengths to hide or shield the funds that he liquidated from his retirement account. . . . Finally, despite being diagnosed with service-related conditions as early as 2018, according to the medical records that he provided, [Husband] continued to work until the Court imposed a substantial temporary support obligation based on his employment.

> As it specifically relates to [Husband]'s Veterans' Administration Disability, [Husband] provided his Veterans' Administration medical records. Those documents list several diagnoses but do not establish that [Husband] is 100% disabled and cannot maintain employment.

(Magistrate's Decision, Dec. 27, 2024.)

{¶ 50} Thus, based on the foregoing and unlike Husband contends, the court did consider his testimony and evidence but did not find it to be credible. The trial court sat through four days of trial and was in the best position to determine the credibility of the witnesses. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Allan v. Allan*, 2019-Ohio-2111, ¶ 80 (8th Dist.), quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24. Indeed, "[t]he trier of fact may take note of any inconsistencies and resolve them accordingly,

'believ[ing] all, part, or none of a witness's testimony.'" *Id.*, quoting *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61 (1964).

{¶ 51} Because it was within the court's province to determine credibility, and based on Veh's testimony, we cannot conclude that the court's imputation of $86,000 was an abuse of discretion.

## 2. Amount Awarded

{¶ 52} In the matter before us, the court awarded Wife spousal support in the amount of $1,250 per month for a period of 108 months. The court retained jurisdiction to modify both the amount and term and found that the order shall terminate upon the death of either of party and may also be modifiable upon Wife's remarriage. The court additionally ordered Husband to pay an additional $500 per month to be credited toward his arrearage, until it is satisfied in full.

{¶ 53} Husband argues there is no evidentiary or statutory basis to order him to pay any spousal support to Wife. Whereas, Wife argues that the court erred in calculating the spousal-support award by disregarding the fact that he previously earned $359,000 per year and was ordered to pay $18,000 per month in spousal support.[4]

{¶ 54} We recognize that when determining spousal support, the trial court need not expressly comment on each R.C. 3105.18(C)(1) factor but must indicate the

---

[4] In the parties' previous divorce case, the court issued a temporary support obligation for Husband to pay $18,000 per month in support to Wife. At that time, the parties' respective counsel agreed that Husband's income was $359,000 annually and Wife's was $70,000 annually.

basis for an award of spousal support in sufficient detail to enable a reviewing court to determine that the award is fair, equitable, and in accordance with the law. *Kaletta v. Kaletta*, 2013-Ohio-1667, ¶ 22 (8th Dist.), citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97 (1988); *Friedler v. Friedler*, 2009-Ohio-4719 (8th Dist.), citing *Stafinsky v. Stafinsky*, 116 Ohio App.3d 781 (11th Dist. 1996). Furthermore, "[t]he goal of spousal support is to reach an equitable result. *Kaechele* at 96. While there is no set mathematical formula to reach this goal, the court must consider all of the factors outlined above and 'not base its determination upon any one of those factors taken in isolation.' *Id.*" *Kaletta* at ¶ 22.

{¶ 55} The factors enumerated in R.C. 3105.18(C)(1) include consideration of: (1) the parties' income from all sources, including income derived from the property division made by the court; (2) the relative earning abilities of the parties; (3) their ages and physical, mental, and emotional conditions; (4) their retirement benefits; (5) the duration of the marriage; (6) the extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home; (7) their standard of living during the marriage; (8) the relative extent of education of the parties; (9) their relative assets and liabilities; (10) the contribution of each party to the education, training, or earning ability of the other party; (11) the time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment; (12) tax consequences of spousal support, and (13) the lost income production

capacity of either party that resulted from that party's marital responsibilities; and (14) any other factor that the court expressly finds to be relevant and equitable.

{¶ 56} Here, the court separately addressed each of the above factors in relation to the evidence presented at trial. The court found that both Husband and Wife were 54 years old at the time of trial and had been married for 28 years. According to the magistrate, the parties' standard of living during their marriage was of limited use for the purposes of spousal support because the parties lived beyond their means, have few assets, and substantial debt.

{¶ 57} The court also found that both parties are college graduates and Husband obtained an MBA, which was funded through the GI Bill. Husband was the primary provider. While providing a substantial income for the family, he was often deployed or overseas with his employment. As a result, Wife raised the parties three children and managed the parties' household, and while doing so, her outside employment was minimal.

{¶ 58} Evidence demonstrated that Wife has two employers, earning $74,363.11 annually. As discussed above, the court found that Husband was underemployed and imputed $86,000 annually, making his total income $133,746.20. Wife asserts that the court disregarded Husband's historical earnings of approximately $260,000 per year from 2020 through 2023 by finding that "he makes a nominal fraction of his true earning potential" and also disregarded that in the previous divorce case, Husband earned $359,000 and was ordered to pay

$18,000 per month in spousal support. (Wife's appellate brief, p. 30.) We find Wife's argument unpersuasive.

{¶ 59} Here, the court addressed in detail its rationale for the earning abilities of the parties and determined that Husband's total annual income for the purposes of spousal support is $133,746.20. The court found that while Husband's conditions rendered him unable to serve as a helicopter pilot in dangerous situations, he could still seek consulting employment as suggested by Veh. Wife's assertion that the court should have relied on Husband's 2019 contractor income of $359,000 and the corresponding $18,500 per month temporary support order was not a meaningful indicator of Husband's earning ability at the time of the 2024 trial, and in light of his testimony regarding his PTSD and subsequent Veterans Administration and Social Security Administration disability determinations.

{¶ 60} Furthermore, at the time of trial, Wife earned $74,363.11 annually, and the court awarded Wife spousal support in the amount of $1,250 per month for 108 months. "'Where the record evidences the trial court's consideration of the statutory allocation factors, and "the judgment contains details sufficient for a reviewing court to determine that the support award is fair, equitable, and in accordance with the law," the determination will be upheld.'" *Trainer*, 2024-Ohio-1581, at ¶ 35 (8th Dist.), quoting *La Spisa v. La Spisa*, 2023-Ohio-3467, ¶ 116 (8th Dist.), quoting *Chattree v. Chattree*, 2014-Ohio-489 (8th Dist.), citing *Daniels v. Daniels*, 2008 Ohio App. LEXIS 772, *9 (10th Dist. Mar. 4, 2008), citing *Schoren v. Schoren*, 2005-Ohio-2102, ¶ 11 (6th Dist.).

{¶ 61} Therefore, Husband's second assignment of error is overruled.

### 3. Duration

{¶ 62} Wife argues that the court erred by setting a termination date to the support instead of awarding her indefinite support. We disagree.

{¶ 63} "'[S]imply because the court was empowered to impose an indefinite award of spousal support, it does not follow that the failure to do so is an abuse of discretion.'" *A.A.O. v. A.M.O.*, 2022-Ohio-2767, ¶ 55 (8th Dist.), quoting *Lojek v. Lojek*, 2010-Ohio-5156, ¶ 64 (4th Dist.). As the Ohio Supreme Court stated:

> "[A]wards of alimony for sustenance and support *should be made terminable upon a date certain in the vast majority of cases wherein both parties have the potential to be self-supporting.* In such cases, an award of alimony *terminable upon a date certain provides both the interim support necessary to the recoverer of the award and certainty in the judgment.*" (Emphasis added.)
>
> . . .
>
> Therefore, "* * * in cases *involving a marriage of long duration, parties of advanced age, and a homemaker-spouse with little opportunity to develop a career, a trial court may, in the proper exercise of its discretion, award alimony terminable only upon certain contingencies * * *.*" (Emphasis added.)

*Kunkle*, 51 Ohio St.3d at 68 (1990), quoting *Koepke v. Koepke*, 466 N.E.2d 570 (6th Dist. 1983).

{¶ 64} Wife, relying on cases where the spouse was medically unable to work or where there is disparity between incomes and the spouse remains the primary caretaker for the minor children, argues that she should have been awarded indefinite spousal support. Wife's reliance on these cases is distinguishable because the was no evidence in the record regarding her inability to support herself or work

outside the home and the children are emancipated. While Wife's testimony about her mental health and her struggles surrounding the divorce is understandable, the evidence revealed that Wife has the ability to work and support herself. Wife testified that she was employed at two places earning a total income of $74,363.11 annually. The evidence further demonstrated that while Husband was the primary earner during their 28-year marriage and Wife stayed at home to raise their children, their children are now emancipated adults.

{¶ 65} Additionally, the parties were 54 years old at the time of trial, and the order is set to expire when each party is approximately 63 years old. The court found that both parties are not at an advanced age and are able to work. Moreover, the court retained jurisdiction to modify both the amount and term and found that the order shall terminate upon the death of either of party and may be modifiable upon Wife's remarriage. And as previously discussed, the court considered all the factors for spousal support under R.C. 3105.18 when making the spousal support determination. Subsequently, we agree with the trial court that a terminable date of 108 months for spousal support is appropriate and equitable to both parties under the circumstances of this case.

### 4. Temporary Spousal Support

{¶ 66} Lastly, Wife argues that the court failed to retroactively modify her temporary support award in accordance with Husband's true income and earning potential of $359,000, effective to March 17, 2023, the date she filed her complaint.

{¶ 67} Here, Wife filed her motion for temporary support on August 10, 2023, and brief in support on October 30, 2023, requesting temporary support in the amount of $18,500 per month based on Husband's income of $359,000. On November 1, 2023, the magistrate issued the temporary support order, ordering the parties to pay for their respective living expenses and equally split the cost of the mortgage on the marital home. Wife's multiple challenges to the temporary order were unsuccessful with the trial court for good reason — using Husband's pre-disability income would have been improper. Wife asks us to impute a higher income for Husband than what he currently earns or is able to earn based upon the testimony provided by her own expert. The court made its determination based on the current earning of the parties and did a proper analysis. Therefore, the court's decision to not modify Wife's temporary support award was proper under the circumstances.

{¶ 68} Thus, based on the foregoing, we find that the trial court's decision is well supported by the record, and we further find no abuse of discretion in the court's spousal-support award. Wife's first cross-assignment of error is overruled.

**D. Contempt**

{¶ 69} In Wife's second cross-assignment of error, Wife argues that the court erred and abused its discretion by failing to find Husband in contempt of court for his admitted refusal to comply with the court ordered temporary support obligation to pay half of the mortgage on the marital residence.

{¶ 70} An appellate court reviews the trial court's finding of contempt for an abuse of discretion. *C.L. v. Weiler*, 2023-Ohio-13, ¶ 19 (8th Dist.), citing *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 11 (1981).

{¶ 71} As previously mentioned, the magistrate's temporary support order in this case provided that "each party shall be equally responsible for the mortgage payments for the marital residence located [in Rocky River, Ohio]." (Temporary Spousal Support Order, Nov. 1, 2023.) Wife filed a motion to show cause based upon Husband's noncompliance with the court's temporary support orders. In his decision, the magistrate found that Husband failed to comply with the temporary support obligation by failing to pay half of the mortgage on the marital residence.

{¶ 72} The purpose of contempt proceedings is "'to secure the dignity of the courts and the uninterrupted and unimpeded administration of justice.'" *Pugh v. Pugh*, 15 Ohio St.3d 136, 140 (1984), quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55 (1971), paragraph two of the syllabus. "'The purpose of sanctions in a case of civil contempt is to compel the contemnor to comply with the lawful orders of a court, and the fact that the contemnor acted innocently and not in intentional disregard of a court order is not a defense to a charge of civil contempt.'" *Id.*, quoting *id.* at paragraph three of the syllabus.

{¶ 73} A review of the record reveals that Husband admitted that he had not been making any of the mortgage payments and he did not know who was making the payments. Wife testified that the mortgage was paid for by from funds she

borrowed from Father.  As a result, the court found that there was a temporary support deficiency of $23,579.66 owed from Husband to Wife.

{¶ 74} While the court did not make a specific contempt finding, the court ordered Husband to pay Wife the outstanding balance of the arrears on the temporary support order.  We do not find that this was an abuse of discretion.  The court exercised its discretion and fashioned a remedy to make Wife whole for Husband's failure to pay his half of the mortgage payments in this matter.

{¶ 75} Therefore, Wife's second cross-assignment of error is overruled.

### E.  Financial Misconduct, Distributive Award, and Treble Damages

{¶ 76} In Husband's third assignment of error, he contends the trial court erred in finding that he committed financial misconduct.  In Husband's fifth assignment of error, he contends the trial court erred and exceeded its authority under R.C. 3105.171(E) when it granted both a distributive award and an unequal division of marital property based on the same finding of financial misconduct.  Husband challenges the legal consequences the trial court imposed, not the underlying financial misconduct finding.  In Wife's third cross-assignment of error, she contends the court erred as a matter of law and abused its discretion by failing to award her treble damages for Husband's misconduct.

### 1.  Financial Misconduct Finding

{¶ 77} Husband argues that the trial court should not have found that he committed financial misconduct because he lacked the "scienter" or "intent"

element to financial misconduct under R.C. 3105.171(E)(4).[5]  He contends that he was disabled, needed the funds for living expenses, and his only motivation to liquidate his retirement account was to be able to pay bills while he was unable to work, not to hid assets from Wife.

{¶ 78} R.C. 3105.171(E)(4) provides:

> If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.

{¶ 79} We recognize that a spouse commits "financial misconduct" when the spouse "'engages in intentional conduct by which he or she either profits from the misconduct or intentionally defeats the other spouse's interest in marital assets.'" *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 138 (8th Dist.), quoting *Rodgers v. Rodgers*, 2017-Ohio-7886, ¶ 30 (8th Dist.), and citing *Best v. Best*, 2011-Ohio-6668, ¶ 17 (10th Dist.) (stating that financial misconduct occurs when one spouse intentionally interferes with the other spouse's property rights).  The complaining spouse bears the burden of proving the financial misconduct.  *Id.* at ¶ 138.

{¶ 80} In *Anderson-Fye*, 2024-Ohio-5909 (8th Dist.), this court stated:

> "As applied to the division of marital property, 'financial misconduct necessarily implicates wrongdoing such as one spouse's [intentional] interference with the other's property rights or the offending spouse's profiting from the misconduct.'" *Young v. Young*, 2022-Ohio-2535, ¶ 6 (9th Dist.), quoting *Tustin v. Tustin*, 2015-Ohio-3454, ¶ 44.  Thus, financial misconduct requires something more than just dishonest

---

[5] "Financial misconduct, in the context of R.C. 3105.171(E)(4), requires 'some element of wrongful intent or scienter[.]'" *Havrilla v. Havrilla*, 2014-Ohio-2747, ¶ 47 (9th Dist.), quoting *Orwick v. Orwick*, 2005-Ohio-5055, ¶ 25 (7th Dist.).

behavior; it also requires some element of wrongful intent. *Id.*, citing *Bucalo v. Bucalo*, 2005-Ohio-6319, ¶ 30 (9th Dist.), and *Havrilla v. Havrilla*, 2014-Ohio-2747, ¶ 47 (9th Dist.).

*Id.* at ¶ 95.

{¶ 81} We note that the "trial court has broad discretion in a divorce proceeding to fashion an award that compensates a spouse for the financial misconduct of the other spouse." *Buskirk v. Buskirk*, 2023-Ohio-70, ¶ 37 (8th Dist.), citing *Trolli v. Trolli*, 2015-Ohio-4487, ¶ 51 (8th Dist.).

{¶ 82} In the matter before us, the court concluded that Husband committed financial misconduct when he liquidated $119,384.63 from his T. Rowe retirement account. We agree with the trial court's determination.

{¶ 83} The evidence demonstrated that upon the dismissal of the first divorce case, Husband anticipated that Wife would file her own case and seek a restraining order on any accounts that he might have. According to Husband, he withdrew $119,271.62 from his account with T. Rowe in order to have access to money, despite the anticipation of such restraining order. This occurred sometime around September 30, 2022. Husband testified that he liquidated the entire account, totaling approximately $100,000, because he "needed it to live on." (Tr. 47.)

{¶ 84} Husband stated that the money was deposited into his bank account. He then converted these funds to precious metals. Husband explained he spent $50,000 on attorney fees and $20,000 on "travel fees for coming back to trial four separate times." (Tr. 48.) Husband maintained that the liquidation occurred during

the brief period after he voluntarily dismissed the initial divorce case and before Wife refiled. He claimed that there was no court order in effect restricting his access to those funds at the time of the withdrawal.

{¶ 85} Then in March 2023, he spent $20,958.15 to purchase silver bars through his JM Bullion account. Husband testified that he resold his silver and gold for cash, but he could not locate any documentation concerning the sale of the silver. Husband further testified that he purchased the gold in Romania with cash from his Bank of America account, but also could not recall any details of when he sold the gold.

{¶ 86} Despite Husband's self-serving assertion that he needed the money to live, the record is clear that he intentionally withdrew the funds in 2022, while under restraining order from the previous divorce case, and did so to avoid having them "frozen" by the trial court. He then took steps to profit from his actions by buying and selling gold and silver bars. In doing so, Husband engaged in a course of conduct designed to conceal and fraudulently dispose of marital assets for the intended purpose of defeating Wife's legitimate marital interest in his retirement account held at T. Rowe.

{¶ 87} Based on the foregoing, the trial court did not abuse its discretion in finding that Husband committed financial misconduct. Husband's third assignment of error is overruled.

## 2. Distributive Award

{¶ 88} Next, Husband challenges the distributive award imposed by the trial court, contending that the court erred and exceeded its authority when it granted both a distributive award and an unequal division of marital property based on the same finding of financial misconduct. As a result, Husband requests that we "reverse and remand with instructions to impose only one remedy consistent with [R.C. 3105.171(E)]." (Husband's brief, p. 23.) We agree.

{¶ 89} R.C. 3105.171(E)(1) allows for a trial court to make a distributive award for financial misconduct in order to "facilitate, effectuate, or supplement a division of marital property." "Distributive award" is defined in R.C. 3105.171(A)(1) as "any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, that are *made from separate property or income, and that are not made from marital property* and do not constitute payments of spousal support, as defined in [R.C.] 3105.18[.]" (Emphasis added.) A distributive award has been described as "'an award from separate property made in order to achieve equity, (1) to compensate a party for the financial misconduct of the other party; (2) to provide relief where it is impractical or burdensome to reach an equitable division comprised of marital property alone; or (3) to effectuate, facilitate, or supplement the disbursement of marital property.'" *Klein v. Cruden*, 2004-Ohio-1479, ¶ 15 (2d Dist.), quoting Sowald, Morganstern, *Domestic Relations Law*, § 12:5, 578-579 (4th Ed. 2002).

{¶ 90} As stated above, R.C. 3105.171(E)(4) provides the trial court with "two remedies to compensate a spouse for the other spouse's financial misconduct: (1) a distributive award, or (2) a greater award of marital property." *T.A. v. R.A.*, 2019-Ohio-3179, ¶ 32 (8th Dist.). Additionally, if a spouse has "substantially and willfully failed to disclose marital property, separate property, or other assets, debts, income, or expenses," the court may compensate the offended spouse "with a distributive award *or* with a greater award of marital property *not to exceed three times* the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse." (Emphasis added.) R.C. 3105.171(E)(5); s*ee also Mousa v. Saad*, 2019-Ohio-4406, ¶ 10 (3d Dist.) ("[I]t is clear from the specific terms used by the General Assembly . . . that it intended to accord broad discretion to a court in formulating an equitable, compensatory award . . . to a spouse who has been aggrieved by the willful and substantial non-disclosure and dereliction of the other spouse's statutory duty under R.C. 3105.171(E)(3) so long as that compensation does not exceed three times the value of the undisclosed assets.").

{¶ 91} In *Strauss v. Strauss*, 2011-Ohio-3831 (8th Dist.), this court stated that "'[t]he distributive award concept is consistent with the well-established principle that trial courts have broad discretion when creating an equitable division of property in a divorce proceeding.'" *Id.* at ¶ 39, quoting *Adams v. Chambers*, 82 Ohio App.3d 462, 466 (12th Dist. 1992), citing *Teeter v. Teeter*, 18 Ohio St.3d 76 (1985). Therefore, "a reviewing court may reverse a trial court's division of property

only upon a showing of an abuse of that discretion." *Victor*, 2020-Ohio-3116, at ¶ 139 (8th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 92} In this case, the court found that Husband committed financial misconduct by liquidating his T. Rowe retirement account in the amount of $119,271.62, which was a marital asset. Wife's marital equity in that account was $59,635.81. Because of the Husband's financial misconduct, the court doubled the entire amount of the account for an award to Wife in the amount of $238,543.24. The court also offset Husband's interest in the parties' marital residence in the amount of $81,729.08 against the award. The magistrate, however, did not clarify whether the compensation for Husband's financial misconduct was a distributive award *or* a greater award of marital property. Rather, the magistrate stated, "to compensate [Wife] pursuant to R.C. § 3105.171(E)(1) through (5), [Wife] is entitled to a distributive award *and* a greater degree of marital property as set forth herein." (Emphasis added.) (Magistrate's Decision, Dec. 27, 2024.) When ruling on the parties' objections, the trial court noted that

> the sum $238,543.24 [compensates [Wife] for [Husband]'s financial misconduct. This award represents double the entire account that [Husband] attempted to hide from [Wife] and the Court and convert for his own use. The Court finds that the award to [Wife] is adequate under the circumstances of this case. [Wife's] interest in the account was one-half of the total or $59,635.81, which she was awarded. She was awarded an additional $178,907.43, which is three times $59,635.81. Although it is not an award of treble damages if the damages are the entire value of the account, it is still a sufficient award to address and to penalize [Husband's] conduct and to make [Wife] whole.
>
> . . .

[Wife] should be awarded a *distributive award* in the amount of $238,543.24, a sum nearly three times her original marital claim.

(Emphasis added.) (Judgment Entry, June 24, 2025.) As to the marital home, the court stated that "[t]he Magistrate considered the entire marital estate in the division of property and provided the appropriate offsets." (Judgment Entry, June 24, 2025.)

{¶ 93} Husband, relying on *Hunter v. Troutman*, 2025-Ohio-366 (8th Dist.), contends that R.C. 3105.171 does not authorize cumulative penalties. But rather, the statute provides alternative remedies, with the court choosing either a distributive award *or* a greater award of marital property. Wife argues that *Hunter* is inapplicable. We agree with Husband.

{¶ 94} As we explained in *Hunter*, "[u]nder a plain reading of R.C. 3105.171(E)(4) and (5) . . . the statute permits *either* a distributive award *or* a greater award of marital property, *not both*, and the Eighth District Court of Appeals has followed this interpretation of the statute." (Emphasis added). *Id.* at ¶ 145, citing *T.A.*, 2019-Ohio-3179, at ¶ 32 (8th Dist.).

{¶ 95} Here, the magistrate imposed both a distributive award by awarding Wife an additional $178,907.43 to her marital portion of the T. Rowe retirement account, and a greater share of the marital estate by offsetting Husband's interest in the parties' marital residence in the amount of $81,729.08. This cumulative remedy

is exactly what the statute prohibits.[6]  Indeed, R.C. 3105.171(A) plainly states that distributive awards "are not made from marital property."  *Hall v. Bricker*, 2024-Ohio-1339, ¶ 39 (10th Dist.).

{¶ 96} While it is true that R.C. 3105.171(E)(4) also permits a trial court to make "a greater award of marital property," we cannot ignore the magistrate and the trial court's statements that Wife's entitlement to a distributive award formed the basis for its decision not to equally divide the T. Rowe retirement account and the equity in the marital residence.  "Were it to appear that a single reference to a distributive award in this context amounted to scrivener's error, our analysis here might well be different."  *Hall* at ¶ 39.  The trial court, however, made it clear that its intention was to make a distributive award to Wife by awarding her an additional $178,907.43 to her marital portion of the T. Rowe account while also awarding her a greater share of the marital estate by offsetting Husband's interest in the parties' marital residence.

{¶ 97} As the Ohio Supreme Court in *Johnson* stated, "[C]ourts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule."  *Johnson*, 2021-Ohio-3304, at ¶ 39.  Therefore, we find that the trial court abused its discretion when it imposed both a

---

[6] Wife's contention that whether the $238,543.24 award was distributive or a greater portion of marital property is harmless error because the total award is less than the maximum treble damages permitted under R.C. 3105.171(E)(5) is unpersuasive.  Wife fails to recognize that the statute does not permit both a distributive award and a greater award of marital property.  *Hunter*, 2025-Ohio-366, at ¶ 145 (8th Dist.), citing *T.A.*, 2019-Ohio-3179, at ¶ 32 (8th Dist.).

distributive award and a greater award of marital property. Husband's fifth assignment of error is sustained.

{¶ 98} On remand, given that the trial court's decision to award Wife compensation for Husband's misconduct under the circumstances of this case is proper, the trial court is instructed to determine an award that is a reasonably equitable distributive award *or* a greater award of marital property in accordance with R.C. 3105.171(E)(4)-(5). *See Cochran v. Cochran*, 2025-Ohio-2565, ¶ 31 (4th Dist.), citing *Liming v. Damos*, 2009-Ohio-6490, ¶ 32 (4th Dist.); *Baker v. Baker*, 2007-Ohio-7172, ¶ 31 (4th Dist.).

### 3. Treble Damages

{¶ 99} Wife argues that the trial court abused its discretion by failing to award her treble damages in the amount of $739,973.67 for Husband's financial misconduct, which is three times the sum of the $119,384.63 from Husband's T. Rowe account, $101,023.24 from a Fidelity account ending in x8277, $5,291.87 from Husband's Coinbase account, and $20,958.15 used to purchase silver bars.

{¶ 100} As stated above, R.C. 3105.171(E)(5) provides that if a spouse has "substantially and willfully failed to disclose marital property, separate property, or other assets, debts, income, or expenses," the court *may* compensate the offended spouse "with a distributive award *or* with a greater award of marital property *not to exceed three times* the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse." (Emphasis added.)

{¶ 101} Here, the record is clear that Husband withdrew $119,271.62 from his T. Rowe retirement account while the first divorce proceeding was pending. Husband was also aware that his accounts would be "frozen" in the second divorce proceeding and took actions to prevent Wife from accessing the funds by transferring them and then converting them into gold, silver, or cryptocurrency. Wife, however, was unable to present conclusive evidence as to the existence of the Fidelity account ending in x8722 and that Husband liquidated this account inappropriately. She relied solely on two deposits into Husband's Bank of America account in March 2023, which was the time period between when Husband dismissed the previous divorce and Wife filed this case. She did not provide any other evidence of the alleged Fidelity account, where it came from, what it represented, records tracing the withdrawals, or proof of nonmarital use. The court found, and we agree, that Wife did not prove by a preponderance of the evidence that there was an independent Fidelity account separate from other retirement accounts. In reaching its decision, the court also considered the $5,291.87 Husband withdrew from his Coinbase account and the liquidated sum of $20,958.15 to purchase silver bars.

{¶ 102} As previously stated, the "trial court has broad discretion in a divorce proceeding to fashion an award that compensates a spouse for the financial misconduct of the other spouse." *Buskirk,* 2023-Ohio-70, at ¶ 37 (8th Dist.), citing *Trolli,* 2015-Ohio-4487, at ¶ 51 (8th Dist.). When reviewing the parties' real property, remaining retirement assets and other accounts, the court found that it

equitable to compensate Wife for Husband's financial misconduct. The trial court declined to impose treble damages, and it was within the court's discretion to do so. This was a proper exercise of discretion by the court.

{¶ 103} Therefore, Wife's third-cross assignment of error is overruled.

## F. Division of Marital Property

### 1. Martial Residence

{¶ 104} Husband's fourth assignment of error challenges the court's valuation of the marital residence. Husband argues the trial court abused its discretion by accepting Wife's lower valuation of $450,000 for the marital residence and rejecting his evidence of the home's higher value at $520,000. Wife contends that Husband waived this argument because he failed to object to the magistrate's valuation of the marital residence and he cannot demonstrate plain error. We agree with Wife.

{¶ 105} Under Civ.R. 53(D)(3)(b)(iv), a party may challenge a magistrate's decision through written objections. An appellant's failure to object to the magistrate's decision bars them from "assign[ing] as error on appeal the court's adoption of any factual finding or legal conclusion" of the magistrate and only allows an appellate court to review the decision for plain error. Civ.R. 53(D)(3)(b)(iv); *State ex rel. Neguse v. McIntosh*, 2020-Ohio-3533, ¶ 9, citing *State ex rel. Hunley v. Dept. of Rehab. & Corr.*, 2019-Ohio-933, ¶ 5; *State ex rel. Pallone v. Ohio Court of Claims*, 2015-Ohio-2003, ¶ 11. In other words, "the court of appeals cannot

consider evidence that the trial court did not have when it made its decision." *Pallone* at ¶ 11, citing *Herbert v. Herbert*, 2012-Ohio-2147, ¶ 13-15 (12th Dist.).

{¶ 106} The Ohio Supreme Court has instructed reviewing courts to "proceed with the utmost caution" when applying the plain-error doctrine in civil matters. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). The *Goldfuss* Court stated, "[T]he plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.* at syllabus.

{¶ 107} In his reply brief, Husband contends that he did not waive this issue because his supplemental objections filed on March 19, 2025, challenged the magistrate's handling of the marital home. He contends that these objections "necessarily encompassed the valuation." (Husband's reply brief, p. 9.)

{¶ 108} Contrary to Husband's contention, a review of his preliminary and supplemental objections reveals that he did in fact fail to raise an objection to the trial court's valuation of the marital residence. While Husband challenged the court's decision not to sell the property, the refusal to require refinancing, the exclusion of Husband's valuation evidence, and the resulting inequity in the division of marital assets, Husband did not raise any issue with the court's specific valuation of $450,000 for the marital residence. Moreover, when addressing Husband's objection regarding the division of marital property, the trial court stated that

Husband made several objections related to the division of marital property, specifically:

> (1) the allocation of the marital residence; (2) the valuation of personal property, a vehicle and bank accounts; (3) the allocation of [Husband's] Bank of America account; (4) the allocation of [Wife's] 401(k); (5) the different duration of marriage for the retirement accounts; (6) the findings as to [Husband's] retirement account; (7) the distributive award to [Wife]; and (8) the division of debt.

(Journal entry, June 24, 2025.)

{¶ 109} The trial court did not consider the valuation because it was not raised and as a result, we likewise cannot consider this evidence. *Pallone* at ¶ 11, citing *Herbert* at ¶ 13-15. Therefore, we review for plain error. According to Husband, if we found "imperfect preservation" of this issue, plain error does exist because the court's marital property valuation of $450,000 was not supported by competent, credible evidence. (Husband's reply brief, p. 9.)

{¶ 110} We recognize that valuing property involves factual inquiries, requiring an appellate court to apply a manifest-weight-of-the-evidence standard of review, which is highly deferential. *T.C. v. R.B.C.*, 2025-Ohio-1544, ¶ 14 (8th Dist.), citing *Kapadia v. Kapadia*, 2011-Ohio-2255, ¶ 24 (8th Dist.); *A.Y. v. E.Y.*, 2023-Ohio-1671, ¶ 18 (8th Dist.). "'An appellate court will not reverse a trial court's valuation if it is supported by some competent, credible evidence." *T.C. v. R.B.C.* at ¶ 14, quoting *Kapadia* at ¶ 24, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).

{¶ 111} Here, Wife testified that the marital home was worth $450,000. Husband testified that the home was worth $520,000, but later testified that he did not know how he arrived at that conclusion and he did not get the house appraised. Wife did not submit an appraisal or corroborating documentation to her valuation, and the magistrate excluded Husband's Zillow printouts from evidence. Ultimately, the magistrate found Wife's testimony as to the value of the real estate to be more credible than that of Husband's and found that the value of the marital home was $450,000. "The trial court was in the best position to make this determination." *Bradley v. Bradley*, 2021-Ohio-2514, ¶ 109 (8th Dist.), citing *Allan*, 2019-Ohio-2111, at ¶ 80 (8th Dist.).

{¶ 112} In light of the foregoing, we do not find that this is the "extremely rare case" where this court is required to apply plain error. Indeed, we do not find that a manifest miscarriage of justice occurred with the court's valuation, nor do we find that the judgment would "have a material adverse effect on the character of, and public confidence in, judicial proceedings" if we left the valuation as it is — Husband cannot demonstrate plain error when the court accepted Wife's valuation over his because he was unable to present any evidence or testimony to refute Wife.

{¶ 113} Therefore, Husband's fourth assignment of error is overruled.

## 2. Marital Debt

{¶ 114} Wife's fourth and final cross-assignment of error challenges the court's division of marital debt. Specifically, Wife maintains the court erred as a matter of law and abused its discretion when it did not order Husband to pay

$46,971.05 or half of the loan she owed Father in order to make the mortgage payments, car payments, and insurance premiums because Husband failed to pay his half of the mortgage as ordered by the court in its temporary support order.

{¶ 115} Here, Wife received a loan from Father to assist Wife in paying her expenses, including the mortgage on the marital residence. At the time of trial, the outstanding loan from Father was $84,502.10. Wife contends that Husband should have been ordered to pay half of the debt or $46,971.05, rather than only half of the unpaid mortgage payments.

{¶ 116} In the temporary support order issued on November 1, 2023, the court ordered each party to pay one-half of the mortgage on the marital residence and both parties were otherwise ordered to pay their own expenses. Based on the evidence presented at trial, the magistrate found that Wife's loan was used to pay for both living expenses related to the marital residence and other expenses not included in the temporary support order. The magistrate further found the mortgage payments from July 2023-October 2024 totaled $47,159.31, which was included in the debt to Father. As a result, the magistrate found a temporary support deficiency of $23,579.66 owed by Husband to Wife. The magistrate concluded that to additionally divide the debt incurred to pay the expenses that Husband was ordered to pay under the temporary support order or to further order Husband to pay the debt incurred to pay the mortgage in addition to awarding Wife a temporary support arrearage would result in a windfall to her.

{¶ 117} The trial court found, and we agree, that this was an appropriate decision by the magistrate. If the magistrate ordered Husband to pay both the arrears related to the mortgage and half of the loan to Father, he would then be ordered to pay twice, which would be improper. The trial court did not abuse its discretion when dividing this marital debt.

{¶ 118} Thus, Wife's fourth-cross assignment of error is overruled.

### G. Attorney Fees

{¶ 119} In Husband's sixth and final assignment of error, he challenges the trial court's order awarding Wife $12,500 for her attorney's fees.

{¶ 120} R.C. 3105.73(A) governs the award of attorney fees in domestic relations cases and provides:

> In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 121} This court has held that "'[t]here are no "automatic attorney fees" in domestic relations cases, and when determining whether to award attorney fees in divorce cases, "the court must start with a presumption that attorney fees are the responsibility of the party who retains the attorney."' (Cleaned up.)" *E.A. v. A.A.*, 2025-Ohio-4583, ¶ 59 (8th Dist.), quoting *A.A.O. v. A.M.O.*, 2022-Ohio-2767, ¶ 58 (8th Dist.), quoting *Victor*, 2020-Ohio-3116, at ¶ 127 (8th Dist.).

{¶ 122} "In determining whether an award of fees is equitable, the court may consider 'the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.'" *Saks*, 2014-Ohio-4930, at ¶ 89 (8th Dist.), quoting R.C. 3105.73(A), and citing *Walpole*, 2013-Ohio-3529, ¶ 33 (8th Dist.). It is well-established that an award of attorney fees lies within the sound discretion of the trial court. *Id.*, citing *Rand v. Rand*, 18 Ohio St.3d 356, 359 (1985). Therefore, we "will not reverse a trial court's award of attorney's fees absent an abuse of discretion." *E.A.* at ¶ 59, citing *Wilson v. Wilson*, 2023-Ohio-1752, ¶ 23 (8th Dist.); *see also J.S. v. A.S.*, 2026-Ohio-459, ¶ 16 (8th Dist.).

{¶ 123} In the matter before us, Wife requested $90,510.19 in attorney fees. Wife argues this amount is warranted because of Husband's improper litigation tactics and financial misconduct. She further argues that an award is appropriate because of Husband's noncompliance with the temporary support order and the disparity in the party's income. Whereas, Husband contends that attorney fees should not be awarded because Wife's counsel's bill was not timely submitted, Wife's counsel's fees are unreasonable, and there is nothing in the record indicating that he caused Wife to incur an increase in attorney fees. Husband further contends that Wife's counsel had a role in and contributed to the length and cost of this litigation. Lastly, Husband argues the award of attorney fees is cumulative punishment because the court relied on its finding of financial misconduct as a factor to award Wife attorney fees.

{¶ 124} A review of the record reveals that the magistrate considered attorney fees in this case only and did not include the fees from the previously dismissed divorce proceedings. For this case, Wife's counsel expended 61.3 hours. Wife's counsel testified that his rate is $700.00 per hour, which totals $42,910. Counsel's associates billed a total of 33.8 hours, with an hourly rate of $350, making their total $11,830. The magistrate found that the total attorney fees for this case was $54,740.

{¶ 125} The magistrate further found that the parties' legal fees were increased because of Husband's attempt to avoid the restraint on marital assets, his dissipating of those assets, his actions relative to his underemployment, and his misrepresentation of his residence. The magistrate also considered Wife's actions, which additionally increased her attorney fees. The magistrate did not find that any failure to comply with the court's order increased either party's litigation expenses. Ultimately, the magistrate ordered Husband to pay to Wife $12,500 in attorney fees.

{¶ 126} In adopting this portion of the magistrate's decision, the trial court found that "the award of some attorney fees to [Wife] in the amount of $12,500.00 appropriate and supported by the evidence." (Judgment entry, June 24, 2025, p. 23.) Although the trial court's journal entry addressed equitable considerations in making an award of attorney fees, it did not make any determinations as to the reasonableness of those fees, neither as to the reasonableness of the time spent on

the matter, nor to the reasonableness of Wife's counsel's $700 hourly rate.[7]  As this

court has previously stated:

> The party seeking an award of attorney fees must demonstrate the reasonableness of the requested fees. *Calypso Asset Mgt., L.L.C. v. 180 Industries, L.L.C.*, 2019-Ohio-2, 127 N.E.3d 507, ¶ 29 (10th Dist.), citing *O'Neill v. Tanoukhi*, 7th Dist. Mahoning No. 10-MA-45, 2011-Ohio-2626, ¶ 20; *Jubilee Ltd. Partnership v. Hosp. Properties, Inc.*, 10th Dist. Franklin No. 09AP-1145, 2010-Ohio-5550, ¶ 52; *Foland v. Englewood*, 2d Dist. Montgomery No. 22940, 2010-Ohio-1905, ¶ 83-84; *TCF Natl. Bank FBO Aeon Fin., L.L.C. v. Cunningham*, 5th Dist. Stark No. 2009 CA 00159, 2010-Ohio-1032, ¶ 9-10; *Turner v. Progressive Corp.*, 140 Ohio App.3d 112, 116-17, 746 N.E.2d 702 (8th Dist.2000)
>
> Although "[t]here is no steadfast rule that the 'reasonableness' of attorney's hours or hourly rate must be established by expert testimony[,]" it has been concluded that the submission of an attorney's itemized bill, standing alone, is insufficient to establish the reasonableness of the charges contained therein. *Cruz v. English Nanny & Governess School*, 8th Dist. Cuyahoga No. 108767, 2020-Ohio-4216, ¶ 41, citing *Cleveland v. CapitalSource Bank*, 8th Dist. Cuyahoga No. 103231, 2016-Ohio-3172, ¶ 13, *Joseph G. Stafford & Assocs. v. Skinner*, 8th Dist. Cuyahoga No. 68597, 1996 Ohio App. LEXIS 4803, 23 (Oct. 31, 1996), *Bolek v. Miller-McNeal*, 8th Dist. Cuyahoga No. 103320, 2016-Ohio-1383, ¶ 12, and *United Assn. of Journeyman & Apprentices of the Plumbing & Pipe Fitting Industry, Local Union No. 776 v. Jack's Heating, Air Conditioning & Plumbing, Inc.*, 3d Dist. Hardin No. 6-12-06, 2013-Ohio-144, ¶ 25.

*Miller v. Miller*, 2020-Ohio-5262, ¶ 15 (8th Dist.).

{¶ 127} Based on the foregoing, we conclude the trial court abused its

discretion when it failed to make a finding of the reasonableness of the award of

attorney fees by determining the reasonableness of the time spent on the matter and

---

[7] We note the court based the attorney fees award, in part, on Husband's financial misconduct — conduct that the court already sanctioned Husband for when it ordered its distributive award.

the reasonableness of the hourly rate. On remand, the trial court must consider whether the attorney fees are reasonable in its attorney fee award. Therefore, the sixth assignment of error is sustained.

{¶ 128} Accordingly, judgment is affirmed in part, reversed in part, and remanded. The trial court's orders related to the distributive award and attorney fees are reversed. On remand, the trial court is instructed to determine a reasonably equitable distributive award or a greater award of marital property in accordance with R.C. 3105.171(E)(4)-(5) and the trial court must consider whether Wife's attorney fees are reasonable in its award.

It is ordered that the parties split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
DEENA R. CALABRESE, J., CONCUR